Johnson, J.
In considering the grounds of this motion, I propose first to examine the proposition contained in the sixth, in the order in which they are set down in the brief: “That the evidence introduced by the State made out a clear case of manslaughter and not of murder.”
This proposition concedes the fact of killing, and assumes that the mortal wound was given when the prisoner was under the influence of sudden heat and passion. The circumstances under which it was given, become, therefore, a necessary m-quiry, and all that are material may be collected from the evidence of Thomas Rodman, detailed in' the notes of the presiding judge, taken on the trial, and the deposition of the deceased, taken before Justice Stinson, the admissibility of which is to be hereafter considered. According to those, it appears that on the I2th of November last, the prisoner went on business to the store kept by the deceased, and in the course of the day commenced a quarrel with one Allen. Two other persons present (Walker and M’Kan,) interposed to prevent their fighting. The prisoner then began a quarrel with M’Kan, who presently got upon his horse and rode off. He then turned on W alker, an old man, much inferior to himself in point of physical strength, and beat and gouged him severely, and was separated from him by the deceased and Allen. Some time after this, the fight was renewed between them in the house, at a time when the deceased was out of the house, and he was told by a negro called Ben that they were fighting again. He went in and endeavored to separate them, but being unable to take the prisoner off Walker, he called in Ben to his assist-anee ; with his aid they were separated, and in the scuffle Ben threw the prisoner against the wall, who called out to part them. The deceased then discovered that the prisoner had a knife in his hand, and attempted to keep out of his way by getting on the opposite side of the counter. When on the counter, in the act of getting over, the prisoner stabbed him in the shoulder, and after he had got over, the prisoner thrust at him again and cut the breast of his coat; a third stab took effect in the right side, inflicting a wound of which he died two days after; and the question is, whether these circumstances make' a casé of murder or manslaughter.
The distinction between murder and manslaughter, as put in the books, and as generally understood by the profession, is not *622 merely an arbitrary rule, but is founded on a thorough knowledge of the human heart, and framed in compassion to the passions and frailties which belong to and are inseparable from our natures. We look in yain through all classes of so-eiety, for even one individual who has so much command of himself as to remain passive and unmoved when suffering under personal injuries. Passion arising out of even imaginary wrongs, frequently gets the ascendancy of distempered minds, and even those that are better regulated are sometimes carried away by the ordinary “ills which flesh is heir to.” These may, however, be subdued and overcome by a proper course of reflection and discipline, and it is our duty to keep them within proper bounds ; but he who has suffered great bodily harm, the parent who sees his child, or the child who sees the parent, suffering under the hand of ruffian violence, or the husband who finds his wife in the embrace of an adulterer, does not stop to reason about the extent to which he will carry his resentment, and in proportion to the degree of provocation will be the almost certain excess of resentment; and if, under the influence ot such an excitement, one man takes the life of another in whose wrong it originated, it is manslaughter and not murder. There must, however, be a provocation — a reasonable provocation, and what will or will not constitute a reasonable provocation, is perhaps the only difficulty in applying the otherwise well defined distinction between the crimes of murder and manslaughter. The line which distinguishes between those provocations which will and will not extenuate the offence, is not, nor can it be, certainly defined. Those provocations which are in themselves calculated to provoke a high degree of resentment, and which ordinarily superinduce a great degree of violence, when compared with those that are slight and trivial, and from which a great degree of violence does not usually follow, may serve as a general outline to mark the distinction, and when applied with judgement and discretion, will usually lead to correct results. Decided cases furnish practical applications of the principle, and are of infinite use in carrying it out. According to those, it is now well established that no provocation, however grievous, will operate to excuse the slayer of the crime of murder, when, from the weapon used, or from the manner of the assault, an intention to kill or to do some great bodily harm was manifest, unless it was accompanied by some act of unlawful violence, or denoting an intention to do bodily harm; nor will even a trivial provocation extenuate the offence, although, in point of law, it may amount to an assault, if the punishment inflicted is outrageous in its nature, either in the manner or circumstance of it, and beyond all proportion to the provocation; because it tpanifests rather *623 a diabolical depravity than the frailty of nature ; and, as more directly applicable to the case in hand, it is laid down by all the criminal law writers, that if one interpose in a fray to separate the combatants, and give notice of his pacific intent, and is slain by one of the affrayers, it is murder. East’s Cr. Law, 233, 234, 304.
The prisoner was in the act of beating Walker, and the only shadow of a provocation proceeding from the deceased towards the prisoner, is founded on the efforts made by the deceased to prevent it; and this, so far from being a reasonable provocation, Was both justifiable and praiseworthy, and within the rule before laid down. That the prisoner had notice of the pacific intention of the deceased, is, I think, apparent from all the circumstances. He had before made an effort to separate them, and finding himself unable to effect it, called in the aid of the negro ; and if the prisoner thought or reflected at all, he must have discovered in these circumstances, that there was no disposition on the part of the deceased to do him unnecessary hurt. The deceased was justifiable in employing as much force as was necessary to prevent the prisoner from beating Walker,{and if he exceeded that limit so far as to become the aggressor, I can well conceive of a state of things which would have extenuated the offence to manslaughter. The prisoner was thrown against the wall by the negro Ben, who was mainly instrumental in separating him from Walker^knd if it was an act of revenge, and not the consequence of tne act of separating them, it would go far to mitigate the offence. But these circumstances were proper for the consideration of the jury, and I have no doubt that the prisoner had the full benefit of them in their deliberations. There is nothing in their conclusion which strikes the mind as improbable or unreasonable, and their verdict is conclusive.
The first five grounds in the order in which they are stated in the brief, are those on which the counsel appeared to rely most in support of the motion. They deny the admissibility of the deposition of the deceased, taken before Justice Stin-son, on the grounds stated in the brief. The facts out of Which they arise are very clearly and fully stated in the report. The mortal wound was inflicted on the 12th of November, the deposition was made on the 13th, at a time when the witnesses all concur in saying that the deceased did not manifest a consciousness that he would die of the wound, but on the next day (the 14th) the deposition was read over to him, when ho remarked, that it was as “ nigh right as he could recollect the circumstances,” and the witnesses, Justices Stinson and Dr. Gaston say, confidently, that his danger was *624 then « obvious and that he himself seemed to be confident of his approaching death.”
The principle on which death bed declarations are admitted is that of necessity. The assassin does not seek the open (]ay or the crowded thoroughfare, to do his deed of darkness, and it frequently happens that none but the victim witnesses the deed. The sanction is that of approaching death. No one who has a proper sense of religion or who believes in a future state of rewards and punishments, would willingly incur the guilt of falsehood, who had before him the immediate prospect of a final account for the deeds done in the body, when every word, thought and deed'd' evil, must rise up for his condemnation. Before they can be received in evidence it must therefore appear that the deceased was in extremis, and that he himself was conscious of his approaching death, to be collected from his conver. sation, or from other circumstances indicating such a state of mind, of which the Court is, in the first instance, the exclusive judge; 1 East’s Cr. Law, 354; Starkie Ev. pt. 4 p. 459.
That such was the state of the mind of the deceased, at the time he assented to and re.affirmed the truth of the deposition which he had made the day before, is as fully proven as it- is possible to prove such a fact, and these grounds are narrowed down to^the inquiry whether this recognition or re-affirmation of the deposition and its contents was admissible as evidence.
The deposition had been read to the deceased, and his declaration was that, “ it was as nigh right as he could recollect the circumstances.” If^he declaration is taken alone and unconnected! (with the deposition it is unintelligible and unmeaning, but'when taken in connection with it, we have a distinct affirmation of the truth of the contents of the deposition, containing in itself a concise and clear statement of the circumstances under which the mortal wound was inflicted ; and that the deposition was admissible follows necessarily from the general rule, that declarations are to be taken altogether, and not garbled by suppressing any part of what was said at the time. The contents of the deposition was as much a part of the declarations of the deceased, as the words which he uttered. The reading of the deposition itself was admissible, as containing better evidence of the contents than could be supplied by parol, and in Trowter’s case, cited in 1 East’s Cr. Law, 356, parol evidence of dying declarations, which had been reduced to writing, were rejected on the ground that the writing itself was higher evidence.
*625 There is very clearly nothing in 1he seventh ground which was superadded by consent at the argument here. It refers to the circumstance that the verdict was written on the envelope of the indictment, on which no part of the indictment is written, but it is endorsed with the title of the case, the finding of the grand jury and the names of the witnesses, and there has not been even an insinuation that the indictment endorsed is not the indictment on which the prisoner was arraigned and tried, and to which the finding of the jury refers, on the contrary these facts are conceded. We are therefore all of opinion that there is nothing in the circumstances of the case, or the several grounds of this motion, upon which the judgement can be arrested, or which entitles the prisoner to a new trial, and the motion is therefore dismissed.
O’Neall and Harper, Js. concurred.